IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KATHLEEN LINEHAN,<br>　　　　　Plaintiff,<br>vs.<br><br>AMERICAN FEDERATION FOR<br>CHILDREN, INC.,<br>　　　　　Defendant. | Case No. 8:26-cv-192<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Kathleen Linehan, by and through undersigned counsel, for her Complaint against Defendant American Federation for Children, Inc. ("AFC"), alleges as follows:

## I.　　INTRODUCTION

1.　　This is an action for disability discrimination, disability retaliation, failure to accommodate, retaliation for opposing sex and race discrimination, and sex-based pay discrimination.

2.　　After more than seven years of successful service, Plaintiff was forced out of AFC only after she disclosed her post-traumatic stress disorder ("PTSD") diagnosis, sought a brief leave and temporary flexibility for treatment, and repeatedly opposed discriminatory treatment of women and minority employees.

3.　　Plaintiff had been a high-performing executive.

4.　　She received promotions, significant raises, bonuses, and expanding leadership responsibility.

5.　　She had no disciplinary history.

6.　　On March 24, 2025, Plaintiff disclosed to AFC Chief Executive Officer Tommy Schultz that she had been newly diagnosed with PTSD, that she had previously been diagnosed with bipolar disorder, and that she might need time away from work for treatment.

7.      This was the first clear, diagnosis-based disclosure that put AFC on notice of Plaintiff's disability and need for accommodation and leave.

8.      Plaintiff had not received her PTSD diagnosis until March 18, 2025.

9.      On March 26, 2025, Plaintiff repeated that disclosure to Schultz and AFC Chief Operating Officer Elisa Linde (formerly Clements) ("Linde") and requested temporary flexibility and a short leave of absence for treatment.

10.     AFC agreed to a short-term accommodation under which Plaintiff would continue working on select matters and be in communication with select co-workers, but step back from meetings, and temporarily work a reduced schedule.

11.     On April 16, 2025, three weeks after Plaintiff's diagnosis-based disability disclosure and request for accommodation and leave, Schultz informed Plaintiff that AFC had decided to terminate her employment.

12.     In explaining that decision, Schultz told Plaintiff that the leave she would need for treatment would create an "HR problem" because it would appear she was being treated more favorably than other employees/

13.     Schultz also told Plaintiff that the decision had not been contemplated before her March 24, 2025 disclosure.

14.     Schultz later further admitted that the decision was based in part on Plaintiff's "pattern of feedback", a reference to Plaintiff's repeated complaints about discriminatory treatment of women and minority employees. Schultz made this admission during discussions about Plaintiff's termination between April 16, 2025 and June 6, 2025.

15.     AFC's conduct violated the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 et seq. ("ADA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1981; and the Equal Pay Act, codified as amended at 29 U.S.C. § 206(d) ("EPA").

16. AFC's conduct also violated the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101 to 48-1125.

17. AFC's conduct also violated the Nebraska Equal Pay Act, Neb. Rev. Stat. § 48-1221.

18. Plaintiff also brings a common-law claim for intentional infliction of emotional distress.

## II.    JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

19. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

20. This Court has jurisdiction over Plaintiff's ADA claim pursuant to 42 U.S.C. § 12117.

21. This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3).

22. This Court has jurisdiction over Plaintiff's EPA claim pursuant to 29 U.S.C. § 216(b).

23. This Court has jurisdiction over Plaintiff's claim under 42 U.S.C. § 1981 pursuant to 28 U.S.C. §§ 1331 and 1343.

24. Venue is proper in the District of Nebraska under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Plaintiff resides in Elkhorn, Nebraska, performed substantial work for AFC from Nebraska, oversaw Nebraska-related initiatives for AFC, including governmental-affairs work, a Nebraska petition and referendum campaign, and securing over $1 million in Nebraska-based contributions, suffered the effects of AFC's unlawful conduct in Nebraska, and AFC directed employment decisions and work assignments into this District.

25. At all relevant times, Plaintiff primarily performed work remotely from her residence in Elkhorn, Nebraska.

26.     While Plaintiff occasionally worked from Washington, D.C. and traveled to AFC offices and events in other states, Nebraska was her primary worksite and the location from which she performed the majority of her day-to-day responsibilities, managed her teams, and carried out AFC-directed work for Nebraska and other states.

27.     Plaintiff maintained her primary residence, bank accounts, voter registration, real property, and medical care in Nebraska throughout her employment.

28.     On or about November 25, 2025, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging disability discrimination, disability retaliation, retaliation for opposing sex discrimination, retaliation for opposing race discrimination, and pay discrimination.

29.     The EEOC issued Plaintiff a Notice of Right to Sue on or about February 6, 2026.

30.     This action is filed within ninety days of Plaintiff's receipt of the Notice of Right to Sue.

31.     To the extent administrative exhaustion is required for any claim asserted herein, all conditions precedent have been satisfied, have occurred, or have been waived.

32.     Plaintiff's EPA and § 1981 claims do not require administrative exhaustion.

33.     This Court has supplemental jurisdiction over Plaintiff's Nebraska claim pursuant to 28 U.S.C. § 1367(a) because that claim arises from the same case or controversy as Plaintiff's federal claims and shares a common nucleus of operative fact with those claims.

34.     Pursuant to Neb. Rev. Stat. § 20-148, Plaintiff brings a civil action to redress deprivation of rights secured by the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101 to 48-1125.

35.   Plaintiff also filed a charge with the Nebraska Equal Opportunity Commission ("NEOC") based on the same facts underlying her federal claims.

36.   To the extent any condition precedent applies to Plaintiff's Nebraska claim, all such conditions have been satisfied, have occurred, or have been excused.

## III.   THE PARTIES

37.   Plaintiff Kathleen Linehan is a resident of Elkhorn, Nebraska.

38.   At all relevant times, Plaintiff was an employee of AFC within the meaning of the ADA, Title VII, and the EPA.

39.   Defendant American Federation for Children, Inc. is a corporate entity doing business in Nebraska and throughout the United States.

40.   On information and belief, AFC may be served through its registered agent authorized to accept service, or as otherwise permitted by law.

41.   At all relevant times, AFC was an employer within the meaning of the ADA, Title VII, and the EPA.

42.   At all relevant times, AFC was an employer within the meaning of the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. § 48-1102(2), employing fifteen or more employees.

43.   On information and belief, AFC employed fifteen or more employees during each of twenty or more calendar workweeks in the current or preceding calendar year, satisfying the employer-coverage threshold under Title VII and the ADA.

## IV.   FACTUAL ALLEGATIONS

### A. *Plaintiff's successful tenure and expanding responsibilities.*

44.   AFC hired Plaintiff in or about March 2018.

45.    Plaintiff quickly became a trusted and effective leader within the organization.

46.    During her tenure, Plaintiff received consistently positive reviews, promotions, raises, bonuses, and increasing organizational authority.

47.    Plaintiff served in senior leadership roles, including Vice President of Communications, Vice President of Development, and later Vice President of Strategic Initiatives.

48.    Plaintiff also oversaw significant strategic and governmental-affairs-related work, including Nebraska-focused policy work and a Nebraska petition and referendum campaign.

49.    Plaintiff supervised substantial teams and responsibilities across communications, development, strategic initiatives, and state-based policy efforts.

50.    During her tenure, Plaintiff helped secure more than $1 million in Nebraska-based contributions for AFC's school choice work.

51.    Plaintiff also created or expanded programs used by AFC in fundraising and donor-cultivation efforts, including the Future Leaders Fellowship.

52.    Plaintiff hired and mentored high-performing staff whose work under Plaintiff's supervision brought in substantial support for AFC.

53.    Plaintiff was never placed on a performance improvement plan.

54.    Plaintiff was never formally disciplined.

55.    Before she disclosed her disability and sought accommodation and leave in March 2025, Plaintiff was never told her job was in jeopardy.

**B. Plaintiff discloses her disability and seeks accommodation and leave in March 2025.**

56.    On March 18, 2025, Plaintiff's new mental health practitioner diagnosed Plaintiff with PTSD and advised that prior diagnoses likely had been mistaken.

57.     On March 24, 2025, Plaintiff attended a reception in New York with Schultz and other colleagues.

58.     Before the reception, Schultz asked Plaintiff to meet for drinks.

59.     During that conversation, Plaintiff disclosed to Schultz for the first time that she had previously been diagnosed with bipolar disorder, that she had now been diagnosed with PTSD, and that she might need time off from work for treatment.

60.     This was the first diagnosis-based disclosure Plaintiff made to AFC that put it on notice of her disability and need for accommodation and leave.

61.     The next day, Schultz told Plaintiff that the issue would be discussed further with Linde.

62.     On March 26, 2025, Plaintiff participated in a call with Schultz and Linde.

63.     During that call, Plaintiff again disclosed her PTSD diagnosis and advised that she might need a short leave of absence for treatment.

64.     The parties agreed that, in the short term, Plaintiff would continue working on select projects and be in communication with select co-workers, but step back from meetings, and have temporary flexibility while a more formal short leave of absence for treatment was discussed.

65.     It was also agreed that Plaintiff would continue communications with certain staff on her team at Plaintiff's discretion during this period.

66.     On April 2, 2025, Plaintiff sent a Slack message to Schultz and Linde announcing she would begin working half days.

67.     Schultz and Linde each responded approvingly, confirming their knowledge of an agreement to the temporary accommodation.

68.     Plaintiff resumed full-time work on or about April 7, 2025.

69.    Plaintiff was at all relevant times capable of performing the essential functions of her job, with or without reasonable accommodation.

**C.  AFC cut short the accommodation process and failed to engage in good faith.**

70.    During the agreed period of reduced duties, Plaintiff requested space from day-to-day work demands and understood that she would step back from meetings while continuing selected work at her discretion.

71.    Despite that agreement, within two days of the March 26 arrangement, Linde, via text message, requested a call with Plaintiff and Schultz during the mutually agreed period of rest.

72.    Plaintiff immediately texted Schultz, explaining that a call would not be helpful during the mutually agreed period of rest.

73.    AFC nevertheless proceeded with the call.

74.    During that conversation, Linde accused Plaintiff of inappropriate communications, which Plaintiff disputed.

75.    Both Schultz and Linde then acknowledged that some of their assumptions regarding those communications had been incorrect.

76.    Plaintiff asked that a written summary of the March 26 arrangement be prepared to avoid future confusion, an idea Linde supported.

77.    AFC's disregard of the agreed accommodation, failure to document any coherent interactive-process plan, and failure to engage in the interactive process in good faith reflect a breakdown in AFC's statutory duty under the ADA.

78.    Instead of continuing the interactive process and allowing Plaintiff a short leave or temporary flexibility, AFC moved quickly toward ending Plaintiff's employment.

**D. AFC decides to terminate Plaintiff within weeks of her disclosure and request.**

79.     After Plaintiff returned to full-time work, Plaintiff and Schultz agreed that Plaintiff would travel to Dallas on April 16, 2025, after a doctor's appointment, so they could speak in person.

80.     At Schultz's suggestion, the meeting took place at a local park rather than at AFC's office.

81.     Schultz began the meeting by asking Plaintiff about her doctor's appointment that morning.

82.     He then informed Plaintiff that AFC had decided to terminate her employment.

83.     In explaining the decision, Schultz told Plaintiff that the leave she would need for treatment would create an "HR problem" because it would appear she was being treated more favorably than other staff.

84.     Plaintiff asked Schultz whether the decision to terminate her had been contemplated before her March 24, 2025 disclosure in New York.

85.     Schultz confirmed that it had not.

86.     Plaintiff explained that her mental health was not an ongoing barrier to her effectiveness at work and that Schultz was making incorrect assumptions.

87.     Schultz responded that he knew Plaintiff well enough to decide what was best for her.

88.     Schultz also told Plaintiff that her "place was outside AFC."

89.     At no point did Schultz or any other AFC decision-maker request medical documentation or conduct any individualized assessment of Plaintiff's ability to perform her job duties.

90.     Plaintiff had, in fact, returned to full-time work on or about April 7, 2025, nine days before she was notified of her termination, and was performing her duties without limitation.

91. Schultz's statements that he "knew what was best for her," that her leave needs would create an "HR problem," and that her "place was outside AFC" reflect that AFC's termination decision was based on assumptions and stereotypes about Plaintiff's mental health conditions, not on her demonstrated ability to work.

92. Plaintiff's termination became effective on June 6, 2025.

93. Following Plaintiff's termination, her duties were reassigned to other personnel, and her position was not eliminated.

### E. Plaintiff repeatedly opposed discriminatory treatment of women and minority employees.

94. Throughout 2024 and 2025, Plaintiff raised concerns to AFC leadership about the differential and discriminatory treatment of female and minority employees, including concerns related to compensation, advancement, leadership access, and treatment.

95. Plaintiff's complaints included objecting to the preferential hiring and compensation of a white male candidate over more experienced minority women, raising concerns about a male executive whose direct reports were almost entirely male and who took adverse actions against a minority female employee who reported to the Plaintiff, and escalating concerns about the unfair treatment of an African American employee.

96. Plaintiff reasonably believed she was opposing unlawful sex and race discrimination and inequitable treatment prohibited by Title VII and § 1981.

### F. AFC admits that Plaintiff's protected activity contributed to her termination.

97. During discussions about Plaintiff's termination between April and June 2025, Schultz told Plaintiff that the decision was based in part on her "pattern of feedback."

98.     The causal connection between Plaintiff's protected activity and her termination is further supported by Schultz's admission that the decision had not been contemplated before Plaintiff's March 24, 2025 disability disclosure.

### G. AFC paid Plaintiff less than comparable male employees.

99.     Plaintiff was paid less than similarly situated and comparable male employees, including the male executive referenced above.

100.     During 2023 and 2024, Plaintiff supervised multiple teams, assumed broader responsibilities spanning communications, development, strategic initiatives, and oversight of Nebraska governmental affairs work including a petition and referendum campaign, and achieved greater measurable outcomes than her male comparator.

101.     AFC's publicly reported Form 990 for 2023 reflects that this executive received a higher salary and bonus than Plaintiff.

102.     On information and belief, AFC also paid other male personnel more than female personnel performing substantially similar or comparable work, including compensating a male Senior Fellow significantly more than female Senior Fellows performing comparable work.

103.     On information and belief, AFC's compensation disparities were not based on seniority, merit, quantity or quality of production, or any factor other than sex.

### H. AFC's post-termination conduct confirms discriminatory and retaliatory animus.

104.     AFC's conduct following Plaintiff's termination and EEOC charge filing further demonstrates the discriminatory animus that motivated its treatment of Plaintiff during her employment.

105.     On or about December 10, 2025, after Plaintiff filed her EEOC charge, Schultz circulated an internal communication to AFC employees characterizing

Plaintiff's pending discrimination claims as "baseless," accusing her of dishonesty and misconduct, asserting disputed factual narratives as established truth, referencing her medical condition and alleged accommodations to individuals with no need to know, and warning employees about communications with Plaintiff.

106. This communication was designed to isolate Plaintiff from former colleagues and potential witnesses, chill cooperation with the EEOC investigation, and prejudice any future proceedings.

107. On or about December 22, 2025, AFC's counsel sent correspondence characterizing Plaintiff's post-termination communications as threatening, referencing Plaintiff's mental health in a stigmatizing manner, accusing Plaintiff of creating a "non-existent love relationship" with AFC's CEO, implying Plaintiff posed a risk of physical violence, and threatening to seek a restraining order.

108. This correspondence weaponized Plaintiff's disclosed disability to portray her as unstable, dangerous, and irrational.

109. AFC's counsel's December 2025 correspondence also disclosed the substance of Plaintiff's private communications with a third-party AI platform and used those communications to mock and stigmatize Plaintiff's mental health condition.

### I. Plaintiff suffered harm.

110. As a direct and proximate result of AFC's unlawful conduct, Plaintiff has suffered and continues to suffer lost wages, lost benefits, lost bonuses, lost employment opportunities, COBRA expenses, damage to reputation, emotional distress, humiliation, mental anguish, inconvenience, and other compensatory damages.

111. In terminating Plaintiff within weeks of her diagnosis-based disability disclosure and accommodation request, and after she opposed discriminatory treatment, AFC's decision-makers acted with malice or reckless indifference to Plaintiff's rights under the ADA, Title VII, and related statutes.

## V.   CLAIMS FOR RELIEF

### COUNT I
### ADA Disability Discrimination

112.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

113.   Plaintiff had an actual disability within the meaning of the ADA, including PTSD and bipolar disorder, and had a record of such disabilities.

114.   Plaintiff's PTSD diagnosis on March 18, 2025 and her history of prior mental health treatment establish both actual disability and a record of disability under 42 U.S.C. § 12102(1)(A) and (B).

115.   Plaintiff also was regarded by AFC as having a mental impairment and was subjected to an adverse employment action because of an actual or perceived impairment, whether or not that impairment substantially limited a major life activity.

116.   AFC subjected Plaintiff to an adverse employment action by terminating her employment.

117.   AFC terminated Plaintiff because of her disability and because of stereotypes and assumptions about her mental health, treatment needs, and future ability to work.

118.   As a direct and proximate result of AFC's ADA discrimination, Plaintiff has suffered damages.

### COUNT II
### ADA Retaliation

119.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

120. Plaintiff engaged in protected activity under the ADA by disclosing her disability, requesting accommodation, requesting temporary flexibility, and requesting or giving notice of the need for leave for treatment.

121. AFC knew Plaintiff had engaged in protected activity.

122. AFC subjected Plaintiff to materially adverse action, including termination.

123. There was a causal connection between Plaintiff's protected activity and AFC's adverse action.

124. That causal connection is shown by, among other things, the temporal proximity between Plaintiff's protected activity and the termination decision, Schultz's admission that the decision was not contemplated before the March 24, 2025 disclosure, and Schultz's statements that Plaintiff's leave needs created an "HR problem."

125. AFC's post-termination conduct, including circulating stigmatizing internal communications about Plaintiff's disability and EEOC charge to employees, and weaponizing Plaintiff's mental health disclosures in counsel correspondence, constituted additional acts of retaliation against Plaintiff for engaging in ADA-protected activity.

126. Retaliation protections under the ADA extend to former employees.

127. As a direct and proximate result of AFC's ADA retaliation, Plaintiff has suffered damages.

## COUNT III
### ADA Failure to Accommodate

128. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

129. Plaintiff had an actual disability and/or record of disability within the meaning of the ADA.

130.    Plaintiff requested reasonable accommodation, including temporary schedule flexibility, temporary relief from meetings, and a short leave of absence for treatment.

131.    AFC was aware of Plaintiff's disability and need for accommodation.

132.    Plaintiff could have been reasonably accommodated.

133.    Rather than engage in the interactive process in good faith and provide the requested accommodation, AFC curtailed the process, violated the agreed-upon terms of the accommodation within days, failed to implement a clear and workable accommodation plan, and terminated Plaintiff because of the accommodation and leave issues.

134.    As a direct and proximate result of AFC's failure to accommodate, Plaintiff has suffered damages.

### COUNT IV
### Title VII Retaliation for Opposing Sex Discrimination

135.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

136.    Plaintiff engaged in protected activity under Title VII by opposing practices she reasonably believed constituted sex discrimination, including unequal pay, unequal advancement, unequal leadership access, and discriminatory treatment of female employees and contractors.

137.    AFC knew Plaintiff engaged in protected activity.

138.    AFC subjected Plaintiff to materially adverse action by terminating her employment.

139.    But for Plaintiff's protected opposition to sex discrimination, AFC would not have terminated her employment.

140. The causal connection is supported not only by the close timing of Plaintiff's protected complaints and her termination, but also by Schultz's admission that the decision was based in part on Plaintiff's "pattern of feedback."

141. AFC's post-termination conduct, including circulating internal communications characterizing Plaintiff's discrimination charge as "baseless" and counsel correspondence stigmatizing Plaintiff's mental health condition, constituted continuing acts of retaliation for Plaintiff's opposition to sex discrimination.

142. Title VII's anti-retaliation protections extend to former employees.

143. As a direct and proximate result of AFC's Title VII retaliation, Plaintiff has suffered damages.

## COUNT V
### Retaliation Under 42 U.S.C. § 1981

144. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

145. Plaintiff engaged in protected activity by opposing race discrimination and inequitable treatment directed at minority employees and contractors, including Hispanic and Black personnel.

146. AFC knew Plaintiff engaged in that protected activity.

147. AFC retaliated against Plaintiff for that protected activity.

148. But for Plaintiff's protected opposition to race discrimination and inequitable treatment of minority employees and contractors, AFC would not have terminated her employment.

149. The causal connection is supported by Schultz's admission regarding Plaintiff's "pattern of feedback" and the close temporal relationship between Plaintiff's protected complaints and the termination decision.

150. As a direct and proximate result of AFC's violation of § 1981, Plaintiff has suffered damages.

## COUNT VI
### Title VII Sex-Based Compensation Discrimination

151. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

152. Plaintiff is female.

153. AFC compensated Plaintiff less favorably than similarly situated and comparable male employees because of sex.

154. Plaintiff performed work requiring equal or greater skill, effort, and responsibility under similar working conditions and/or work sufficiently comparable to support relief under Title VII.

155. Sex was a motivating factor in AFC's compensation decisions affecting Plaintiff.

156. As a direct and proximate result of AFC's sex-based compensation discrimination, Plaintiff has suffered damages.

## COUNT VII
### Equal Pay Act

157. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

158. AFC paid wages to Plaintiff at a rate less than the rate at which it paid one or more male employees, in violation of the Equal Pay Act, 29 U.S.C. § 206(d).

159. Plaintiff and the higher-paid male comparator or comparators performed jobs requiring equal skill, effort, and responsibility and under similar working conditions.

160. Any pay differential was not based on a seniority system, a merit system, a system measuring earnings by quantity or quality of production, or any factor other than sex.

161. AFC's violation of the EPA was willful.

162.   As a direct and proximate result of AFC's EPA violation, Plaintiff is entitled to unpaid wages, liquidated damages, and other relief permitted by law.

## COUNT VIII
### Nebraska Fair Employment Practice Act — Disability Discrimination, Retaliation, and Failure to Accommodate

163.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

164.   Pursuant to Neb. Rev. Stat. § 20-148, Plaintiff brings this civil action to redress deprivation of rights secured by the Nebraska Fair Employment Practice Act ("NFEPA"), Neb. Rev. Stat. §§ 48-1101 to 48-1125.

165.   The NFEPA prohibits an employer from discharging or otherwise discriminating against an employee with respect to compensation, terms, conditions, or privileges of employment because of disability, and prohibits retaliation against an employee for opposing unlawful employment practices or for participating in proceedings under the Act.

166.   Plaintiff had a disability within the meaning of the NFEPA, including PTSD and bipolar disorder, and was qualified to perform the essential functions of her position with or without reasonable accommodation.

167.   AFC violated the NFEPA by discriminating against Plaintiff because of disability and/or perceived disability, including by terminating her employment because of her disability or because AFC regarded her as impaired, in violation of Neb. Rev. Stat. § 48-1104.

168.   AFC further violated the NFEPA by failing to make reasonable accommodations to the known physical or mental limitations of Plaintiff, an otherwise qualified employee with a disability, including temporary schedule flexibility and a short leave of absence for treatment, in violation of Neb. Rev. Stat. § 48-1107.02(1)(e).

169. AFC further retaliated against Plaintiff for engaging in protected activity under the NFEPA, including disclosing her disability, requesting accommodation, requesting leave for treatment, and opposing unlawful discriminatory practices, in violation of Neb. Rev. Stat. § 48-1114.

170. As a direct and proximate result of AFC's violations of rights secured by the NFEPA, Plaintiff has suffered damages, including lost wages, lost benefits, lost bonuses, lost employment opportunities, COBRA expenses, emotional distress, humiliation, mental anguish, reputational harm, and other compensatory damages.

171. Plaintiff seeks all remedies available under Nebraska law for deprivation of rights secured by the NFEPA, including back pay, front pay, compensatory damages, injunctive relief, attorneys' fees and costs to the extent permitted by law, and such other relief as the Court deems just and proper.

## COUNT IX
### NFEPA Sex-Based Compensation Discrimination

172. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

173. The NFEPA prohibits discrimination in compensation on the basis of sex. Neb. Rev. Stat. § 48-1104.

174. Plaintiff is female.

175. AFC compensated Plaintiff less favorably than similarly situated and comparable male employees because of sex.

176. Plaintiff performed work requiring equal or greater skill, effort, and responsibility under similar working conditions as her male comparators.

177. Sex was a motivating factor in AFC's compensation decisions affecting Plaintiff.

178. As a direct and proximate result of AFC's sex-based compensation discrimination in violation of the NFEPA, Plaintiff has suffered damages, including lost wages and other compensatory damages.

## COUNT X
### NFEPA Retaliation for Opposing Discriminatory Practices

179. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

180. The NFEPA prohibits retaliation against an employee for opposing practices made unlawful by the Act. Neb. Rev. Stat. § 48-1114.

181. Plaintiff engaged in protected activity under the NFEPA by opposing practices she reasonably believed constituted sex discrimination and race discrimination, including unequal pay, unequal advancement, unequal leadership access, and discriminatory treatment of female and minority employees and contractors.

182. AFC knew Plaintiff engaged in that protected activity.

183. AFC retaliated against Plaintiff by terminating her employment.

184. But for Plaintiff's protected opposition to discriminatory practices, AFC would not have terminated her employment.

185. The causal connection is supported by Schultz's admission that the decision was based in part on Plaintiff's "pattern of feedback" and the close temporal relationship between Plaintiff's protected complaints and the termination decision.

186. As a direct and proximate result of AFC's retaliation in violation of the NFEPA, Plaintiff has suffered damages, including lost wages, lost benefits, emotional distress, humiliation, reputational harm, and other compensatory damages.

## COUNT XI
### Intentional Infliction of Emotional Distress

187. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

188. AFC, through its agents and counsel, engaged in extreme and outrageous conduct directed at Plaintiff that went beyond all possible bounds of decency.

189. Following Plaintiff's termination and filing of her EEOC charge, AFC circulated an internal communication to its employees characterizing Plaintiff's pending discrimination claims as "baseless," disclosing her medical condition and accommodation history to individuals with no need to know, and warning employees about communications with Plaintiff.

190. AFC's counsel then sent correspondence accusing Plaintiff of creating a "non-existent love relationship" with AFC's CEO, implying she posed a risk of physical violence, threatening to seek a restraining order, disclosing the substance of Plaintiff's private communications with a third-party platform, and using those communications to mock and stigmatize her mental health condition.

191. AFC's conduct was not a legitimate response to any business concern or legal dispute.

192. AFC's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community.

193. AFC intended to cause Plaintiff severe emotional distress, or acted with reckless disregard of the probability that its conduct would cause such distress.

194. As a direct and proximate result of AFC's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including but not limited to exacerbation of her PTSD symptoms, anxiety, humiliation, reputational harm, and mental anguish.

## COUNT XII
### Nebraska Equal Pay Act

195. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

196.    The Nebraska Equal Pay Act, Neb. Rev. Stat. § 48-1221, prohibits an employer from discriminating between employees on the basis of sex by paying wages to any employee at a rate less than the rate at which the employer pays any employee of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions.

197.    Plaintiff is female.

198.    AFC paid wages to Plaintiff at a rate less than the rate at which it paid one or more male employees for equal work on jobs requiring equal skill, effort, and responsibility performed under similar working conditions.

199.    Any pay differential was not based on a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or any factor other than sex.

200.    As a direct and proximate result of AFC's violation of the Nebraska Equal Pay Act, Plaintiff is entitled to unpaid wages, liquidated damages, and other relief permitted by law.

## VI. PRAYER FOR RELIEF

201.    WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant AFC and award the following relief:

    a. A declaration that AFC violated Plaintiff's rights under the ADA, Title VII, § 1981, the EPA (including its medical confidentiality provisions), the Nebraska Fair Employment Practice Act, and the Nebraska Equal Pay Act;

    b. Injunctive relief prohibiting further discrimination, retaliation, and unlawful compensation practices;

    c. Back pay, lost wages, lost salary, lost bonuses, lost benefits, and all other lost compensation;

d.  Front pay and/or reinstatement as permitted by law;

e.  Compensatory damages for emotional distress, humiliation, mental anguish, inconvenience, and reputational harm as permitted by law;

f.  Liquidated damages under the EPA as permitted by law;

g.  Punitive damages to the fullest extent permitted by law, including under Title VII, 42 U.S.C. § 1981a(b), and § 1981, based on AFC's malice or reckless indifference to Plaintiff's federally protected rights;

h.  Prejudgment interest and post-judgment interest;

i.  Reasonable attorneys' fees, expert fees, costs, and litigation expenses;

j.  All damages and remedies available under Nebraska common law, including for intentional infliction of emotional distress;

k.  Such equitable and make-whole relief as the Court deems just and proper; and

l.  Such other and further relief as the Court deems just and proper.

## VII. JURY DEMAND

202.  Plaintiff demands a trial by jury on all issues so triable.

DATED: _____

Kathleen Linehan, Plaintiff

By:  */s/ Justin T. Wayne*_____
Justin T. Wayne (NE #23310)

WAYNE LAW, LLC
P.O. Box 265
Omaha, NE 68101
Telephone: (402) 933-6603
Facsimile: (402) 833-7128
Email: justin@justinwaynelaw.com